UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| BILLY E. DORRIS,<br><br>Plaintiff,<br><br>vs.<br><br>JO ANNE B. BARNHART,<br>Commissioner of Social Security,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:05CV00110 AGF |

**MEMORANDUM AND ORDER**

This action is before the Court for judicial review of the final decision of the Commissioner of Social Security, denying Plaintiff Billy Dorris's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434 and supplemental security income (SSI) under Title XVI of the Act, 42. U.S.C. §§ 1381-1384f.[1] For the reasons set forth below, the Court will affirm the decision of the Commissioner.

Plaintiff, who was born on September 13, 1957, applied for benefits on August 9, 2002, alleging a disability onset date of January 15, 2002, due to glomerulonephritis (a kidney disease) and heart disease. Tr. at 129-33. Following a hearing on June 10, 2004, an Administrative Law Judge (ALJ) found on October 22, 2004, that Plaintiff was not disabled. The Appeals Council of the Social Security Administration declined to review

---

[1] The parties have consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

the ALJ's decision. Plaintiff has thus exhausted all administrative remedies and the ALJ's June 10, 2004 decision stands as the final agency action.

Plaintiff contends that the ALJ erred in finding that Plaintiff could perform the full range of sedentary work. Specifically, Plaintiff argues that the ALJ improperly discounted the opinion of Plaintiff's treating cardiologist, and improperly failed to consider Plaintiff's impairments in combination.

## BACKGROUND

### Medical Record

On January 11, 1999, Troy Wells, P.A., diagnosed Plaintiff with hypertension, and an EKG performed at that time was "borderline." Tr. at 270-71. On May 18, 1999, Mr. Wells noted that Plaintiff reported episodes of pain and numbness in his chest. Tr. at 265. On October 13, 2000, Plaintiff complained of knee pain, and Robert Floss, M.D., reported mild arthritic symptoms, but stable cardiovascular condition. Tr. at 260. On November 27, 2000, it was noted that Plaintiff was taking the following medications: Captopril, Calan, Clonidine, and Naproxen. Tr. at 260.

On July 3, 2002, Plaintiff had a heart attack. He was treated for an "acute massive anterior wall myocardial infarction" at a hospital in Arkansas, and a stent was successfully implanted. At that time, a catheter revealed an ejection fraction of 50 percent.[2] Tr. at 230. On the same day, Plaintiff had a nephrology consultation from

---

[2] The ejection fraction is a measurement of a heart's efficiency, and is used to estimate the function of the left ventricle, which pumps blood to the rest of the body. A (continued...)

David DeSoto, M.D., who noted a history of infectious glomerulonephritis and hypokalemia (low potassium level). Tr. at 233. Plaintiff was discharged on July 6, 2002, with the following diagnoses: acute anterior wall myocardial infarction, history of nephritis, a left renal mass, history of severe hypertension, mixed dyslipidemia, and mild renal insufficiency. Discharge medications included Accupril, Toprol, Plavix, Pravachol, Exotrin, and Niaspan. Tr. at 231. On July 25, 2002, Charles M. Friedman, M.D., analyzed Plaintiff's renal scan and reported that the functioning of both kidneys was normal. Tr. at 228.

The record includes a Disability Supplemental Interview Outline completed by Plaintiff's wife on August 9, 2002. She noted that Plaintiff could not do some activities, such as garden work, due to lack of energy, but that he was able to take out the trash, wash the car, drive, and walk for exercise and errands. Tr. at 129-130.

Plaintiff was examined for the Social Security Administration on November 4, 2002, by Jerry Grant, M.D. The diagnosis was recent myocardial infarction with mild left ventricular dysfunction and successful stent placement, hypertension, tobacco abuse,

---

[2](...continued)
normal ejection fraction is more than 55 percent. WebMD, ***Ejection Fraction*** (Sept. 19, 2006), ***available at*** http://www.webmd.com/hw/health_guide_atoz/ug1391.asp.

When accompanied by other symptoms, an ejection fraction below 30 percent qualifies as a presumptive disability under the Act. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.02B.

hyperlipidemia, and renal mass with history of nephritis. Dr. Grant stated that Plaintiff could walk, stand, sit, lift, and carry objects with mild limitations. Tr. at 211-17.

On November 19, 2002, Alice Davidson, M.D., completed a physical residual functional capacity (RFC) assessment of Plaintiff for the state agency for disability determinations. Her primary diagnosis was coronary artery disease and her secondary diagnosis was hypertension. Dr. Davidson indicated in check-box format that Plaintiff could sit for about six hours in an eight-hour workday; stand/walk for at least two hours in an eight-hour workday; use either hand and/or foot for unlimited repetitive movement; lift up to ten pounds occasionally; frequently lift less than ten pounds; and occasionally climb, balance, stoop, kneel, crouch, and crawl. She also indicated that Plaintiff did not have any manipulative, visual, communicative, or environmental limitations. Tr. at 138-145. Robert Redd, M.D., another state agency physician, summarily indicated that he had reviewed and affirmed Dr. Davidson's assessment on March 31, 2003. Tr. at 145.

On November 25, 2002, Dr. DeSoto reported that Plaintiff had a white mass in his left kidney, as well as significant thrombocytopenia (an abnormal platelet count). On February 3, 2003, Dr. DeSoto advised Plaintiff that the white spot needed further investigation. Tr. at 209-10. Plaintiff saw nephrology specialist Frank Braxton, M.D., on June 26, 2003, for evaluation of his glomerulonephritis. Dr. Braxton diagnosed Plaintiff with chronic glomerulonephritis and ordered urine tests and a renal ultrasound. Tr. at 191. On July 1, 2003, the results of the renal arteriogram indicated that there was no tumor vascularity in Plaintiff's kidneys and that everything was "essentially normal." Tr.

at 196. On August 2, 2003, Plaintiff's medications included Accupril, Plavix, Pravachol, Lasix, Toprol, Paxil, and Cerquil. Tr. at 190.

Plaintiff first saw cardiologist Alan Weiss, M.D., on January 21, 2004. Dr. Weiss reported that Plaintiff complained of dull chest pains at night, similar to myocardial infarction but not as intense, at the rate of three times a week. Plaintiff also reported shortness of breath and diaphoresis (excessive sweating). Dr. Weiss found that Plaintiff's blood pressure indicated that his hypertension was currently well-controlled. Tr. at 174-75. Dr. Weiss scheduled a heart catheterization, which was performed by Alan Tiefenbrunn, M.D., on February 2, 2004. Dr. Tiefenbrunn noted mild left ventricular dysfunction, no valve disease, and mild in-stent restenosis of the left anterior descending coronary artery. He opined that Plaintiff was in satisfactory condition, did not believe that further intervention was needed, and recommended a continuation of conservative treatment. Tr. at 171.

Plaintiff saw Dr. Weiss on March 1, 2004, at which time Dr. Weiss reported to Plaintiff's physician, David Gayle, M.D., that the catheterization showed some borderline in-stent stenosis with 40 to 50 percent occlusion of the left anterior descending (LAD) coronary artery in the location of the previous stent. Dr. Weiss also noted mild ventricular dysfunction and some persistent nonexertional chest discomfort. Dr. Weiss noted that he scheduled Plaintiff for a thallium stress test. Plaintiff's medications at that time included Plavix, Lovastatin, Lisinopril, Toprol, Lasix with potassium, Paxil, and Seroquel. Tr. at 168.

On March 4, 2004, Plaintiff went to the hospital with complaints of anxiety and depression over the last several months. Plaintiff was diagnosed with coronary artery disease and depression. He was prescribed an increased dosage of Paxil and referred for a cardiolyte stress test and to a counselor. Tr. at 182-83. The results of the stress test showed "a persistent defect along the inferior wall of the left ventricle," suggesting inferior wall myocardial scarring. The left ventricular ejection fraction was 49 percent. and wall motion was satisfactory. The test also showed mild dilatation of the left ventricle. Tr. at 179.

On March 18, 2004, Dr. Gayle noted that Plaintiff's depression was improving slowly. Tr. at 177. On March 30, 2004, Dr. Gayle diagnosed Plaintiff with sinusitis, continued depression, and impotence. He noted that Plaintiff did not use nitroglycerine regularly. Dr. Gayle prescribed Viagra, Claritin, Zephrex, and Amoxil. Tr. at 175-76.

On May 17, 2004, Dr. Weiss reported that Plaintiff had been having persistent nonexertional chest discomfort. Tr. at 167. By letter dated June 7, 2004, Dr. Weiss advised Plaintiff's attorney that based upon the results of the March 15, 2004 stress test and Plaintiff's nonexertional chest discomfort, he felt that "[Plaintiff] is totally disabled. He is only able to perform activities of daily living and is not capable of any significant exertion." Tr. at 166.

**Evidentiary Hearing of June 10, 2004**

Plaintiff, who was represented by counsel, testified that he was 46 years old, and had completed eighth grade. He stated that, without trying to, he had lost 37 pounds in

the previous six months. Plaintiff said that he had worked in route sales for the 15 years prior to his alleged disability onset date, most recently selling medical equipment, and before that, selling Schwann's Frozen Foods. Tr. at 24-25.

Plaintiff next testified as to his medical conditions. He stated that he had glomerulonephritis, which was discovered at a young age, as well as a mass in his lower left kidney. He testified that his left leg and foot would fall asleep when he sat for "any period of time." In addition, he had chronic high blood pressure and coronary artery disease. Plaintiff testified that he was living with his parents because he did not work and therefore had no income. He stated that he took medicine for his heart, but "sooner or later [doctors are] going to have to go back in there." Tr. at 26-30.

Plaintiff testified that his main medical problems were his heart and his kidney. He stated that he got short-winded and had chest pains when walking up an incline. He also reported that a doctor diagnosed him with chronic nephritis and told him that this condition would worsen as Plaintiff aged and that Plaintiff may have to be placed on dialysis. Plaintiff testified that any kind of exertion aggravated his kidney condition. He claimed that some days he had so little energy that he did not want to get out of bed. Tr. at 31-33.

Plaintiff testified that on a typical day when he woke up, he first had to take his medicine or else he felt poorly. He then watched television until about 10:30 a.m., at which point he took a nap. He took another nap around 2:30 or 3:00 p.m. Plaintiff stated

that he did not see anyone besides his parents,[3] and did not engage in activities outside of their home. He also said that when he was working in route sales, his employers allowed him to nap after lunch. Plaintiff testified that he worked for Schwann's at least eight different times and quit each time because he was so tired that he could not perform the job. When Plaintiff subsequently worked for the medical supplies company, his duties included going to customers' homes to take orders and deliver goods. He stated that he quit this job when he felt he could not work anymore. He also stated that he felt that his condition had gotten worse since he stopped working. Tr. at 33-37.

When asked about his other symptoms, Plaintiff testified that he saw spots, had decreased appetite, and experienced headaches, nose bleeds, frequent urination, skin discoloration, bruising, chronic hives, prolonged bouts of hiccups, muscle cramps, and facial and ankle edema. Tr. at 37-41. Plaintiff testified that he had abnormally high amounts of protein in his urine due to the glomerulonephritis. He explained that his kidneys did not retain protein, and that as a result he often became fatigued and confused. He stated that he could do mathematics and could read and write, but could not comprehend and follow written directions. Tr. at 41-45.

When asked about pain, Plaintiff testified that his lower back hurt constantly, as did his left leg. He stated that he was in mild or moderate pain all the time, and that only bed rest eased the pain. Additionally, he said that he experienced numbness in the toes of

---

[3] Plaintiff testified that his wife had left him and that he had moved up to the area to live with his parents. Tr. at 29.

his left foot. He reported that a doctor once told him that the numbness was from tarsal tunnel syndrome. Tr. at 46-48.

Plaintiff testified that he was able to dress himself and take care of his personal hygiene needs. However, he got winded using the stairs, and could not sit for longer than about one hour because his lower extremities would get numb. He also stated that his left leg would give out on him while he was standing or walking, and that he could not stand for more than ten minutes before experiencing discomfort. He testified that he did not do any heavy lifting, but that he could lift a gallon of milk and carry it 10 or 12 feet. He stated that he would not lift 20 pounds because he would "regret it." He also reported numbness in his hands and swelling of the elbows, possibly due to arthritis. In addition, Plaintiff complained of neck and shoulder pains that caused shaking in those areas. Plaintiff said that he could not stand hot weather, and that he had to be in the shade when it was sunny or he would become fatigued. He had had 15 to 20 bouts of dizziness in the past three years, and periodic episodes of forgetfulness. Tr. at 49-57.

Plaintiff testified that although he drove 80 miles to the hearing, usually he drove less than 50 miles in one month, and that his sister did his grocery shopping for him. At the time of the hearing, Plaintiff was receiving Medicaid and food stamps. He stated that he went to bed around 10:00 p.m. and woke up around 5:30 or 6:00 a.m., and usually slept well. Plaintiff said that there was no treatment for his glomerulonephritis, other than trying to control his blood pressure. Tr. at 58-60.

**ALJ's Decision of October 22, 2004**

The ALJ held that Plaintiff had chronic glomerulonephritis, coronary artery disease, back pain, joint pain, and numbness, which were severe impairments, but which did not meet the requirements of a disabling impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ noted that Plaintiff had received "some therapy" (seeing a counselor and taking Paxil) for depression and anxiety, but that no mental health professional had described any vocationally relevant mental limitations. The ALJ concluded that the record did not reflect a severe mental impairment. Tr. at 18.

The ALJ turned to consider whether Plaintiff retained the residual functional capacity (RFC) to perform his past relevant work or other work in the national economy. The ALJ cited Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), as setting forth the guidelines for considering a claimant's subjective complaints. The ALJ stated that Plaintiff would not be able to work if his complaints were fully credible, but that he found that Plaintiff's complaints were not fully credible. The ALJ gave no more weight to the opinion of Plaintiff's treating cardiologist, Dr. Weiss, than to the opinions of Plaintiff's other physicians. The ALJ determined that Dr. Weiss's opinion that Plaintiff was disabled consisted "of nothing more than vague, conclusory statements." Tr. at 14-15.

The ALJ noted that Plaintiff did not use nitroglycerine frequently, and that the record did not reflect limitations imposed upon Plaintiff's activities even when he was discharged from the hospital after his July 2002 heart attack. The ALJ noted that Plaintiff

was provided with Viagra in March 2004, which the ALJ believed was inconsistent with Plaintiff's claimed limitations and the limitations described by Dr. Weiss. Tr. at 15.

The ALJ also found that although the Plaintiff testified that he was disabled by back pain and his kidney condition, he worked with those symptoms for many years. The ALJ also mentioned that while Plaintiff testified that he had numbness in his hands and feet, he never reported such numbness to his doctors. The ALJ stated that Plaintiff had coronary artery disease with "minimal objective findings." Tr. at 15.

The ALJ stated that state agency medical experts, including Dr. Davidson, "completed assessments of the claimant's impairments. Physically, they opined that Plaintiff had 'severe' impairments and was capable of performing sedentary work. Dr. Davidson offered a well-rationalized explanation for these findings. This assessment is consistent with the evidence of record through March 31, 2003." Tr. at 15-16.[4]

The ALJ concluded that Plaintiff had the RFC to perform unskilled work that required lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, that was generally performed while seated but could require standing and walking, off and on, for up to two hours in the regular work day, and that did not require regular or frequent stair climbing and descending. The ALJ found that Plaintiff could not perform his past relevant work with this RFC, but could perform

---

[4] The record submitted to the court does not contain a narrative explanation by Dr. Davidson nor assessments by other state medical experts, other than Dr. Redd's summary concurrence with Dr. Davidson's assessment.

"essentially" the full range of sedentary work.[5] The ALJ applied the Commissioner's Medical-Vocational Guidelines, 20 C.F.R., Pt. 404, Subpt. P, App. 2, which directed a finding of "not disabled" based upon Plaintiff's age, education, and past work experience. Tr. at 15-16.

## STANDARD OF REVIEW AND STATUTORY FRAMEWORK

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision' . . . . [T]he court must 'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v.

---

[5] Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

"Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about two hours of an eight-hour workday. Sitting would generally total about six hours of an eight-hour workday. Unskilled sedentary work also involves other activities, classified as "nonexertional," such as seeing; manipulation; and understanding, remembering, and carrying out simple instructions.

Social Security Ruling (SSR) 96-9p, 1996 WL 374185, at *3 (July 2, 1996).

Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)-(2). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities, including physical functions, such as walking, standing, or sitting; as well as mental functions, such as understanding, carrying out and remembering simple instructions, and responding appropriately to supervision and co-workers. 20 C.F.R. § 404.1521(b).

If the claimant's impairment is not severe, the claim is denied. If the impairment is severe, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in the Commissioner's regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is equivalent to one of the listed impairments, the claimant is conclusively presumed to be disabled. If the

impairment is one that does not meet or equal a listed impairment, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work, if any. If the claimant has past relevant work and is able to perform it, he is not disabled. If he cannot perform his past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

Where a claimant can perform the full range of work in a particular category of work defined at 20 C.F.R. § 404.1567 (very heavy, heavy, medium, light, and sedentary), the Commissioner may rely upon the Guidelines to meet her burden at step five. The Guidelines take administrative notice of the existence of numerous unskilled occupations within each of the exertional levels. Social Security Ruling 96-9p, 1996 WL 374185, *2. Where a claimant cannot perform the full range of work in a particular category due to nonexertional impairments, such as pain or mental disorders, the Commissioner must present testimony by a vocational expert to meet her burden at step five. Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006).

## DISCUSSION

### Discounting Treating Physician's Opinion

Plaintiff argues that the ALJ committed reversible error in not properly weighing Dr. Weiss's opinion that Plaintiff was disabled. The ALJ stated that he did not give Dr.

Weiss's opinion controlling weight because the ALJ found that the opinion was vague and conclusory. It also appears that the ALJ concluded that this opinion was inconsistent with other evidence in the record and the level of treatment Plaintiff received. Tr. at 14. The Court finds support in the record for this conclusion. After performing the heart catheterization in February 2004, Dr. Tiefenbrunn found that Plaintiff was in satisfactory condition. Dr. Tiefenbrunn recommended no further intervention and that conservative treatment continue. Tr. at 172. Dr. Weiss himself noted that Plaintiff's hypertension was well-controlled in January 2004, and that Plaintiff had only mild ventricular dysfunction in March 2004. Tr. at 174, 168. Also in March 2004, Dr. Gayle stated that Plaintiff did not take nitroglycerine regularly, and on that same date Plaintiff requested and received a prescription for Viagra. Tr. at 176.

Most significantly, a physician's opinion, even that of a treating specialist, on whether a Plaintiff is "disabled" is not controlling, as that is a statutory determination to be made by the Commissioner. Choate v. Barnhart, 457 F.3d 865, 870 (8th. Cir. 2006); Cruze v. Chater, 85 F.3d 1320, 1325 (8th Cir. 1996). In the same letter in which Dr. Weiss stated that he felt that Plaintiff was "totally disabled," he also wrote that Plaintiff could perform activities of daily living and was not capable of any "significant" exertion. Sedentary work does not require significant exertion. In addition, Plaintiff's ejection fraction of 49 percent is only slightly below a normal rate. As noted earlier, an ejection fraction above 30 percent is not a listed disabling impairment. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.02B. In sum, the Court believes that the ALJ was entitled to discredit Dr.

Weiss's opinion regarding Plaintiff's level of disability. See Choate, 457 F.3d at 870 (ALJ did not err in declining to give controlling weight to plaintiff's treating cardiologist's opinion that plaintiff was disabled due to cardiac condition, where opinion was unsupported by the objective medical evidence).

**Considering Plaintiff's Impairments in Combination**

Plaintiff also argues that the ALJ failed to consider the combined effect of his kidney and heart conditions. It is true that the ALJ must consider impairments in combination. 20 C.F.R. § 404.1523; Anderson v. Heckler, 805 F.2d 801, 805 (8th Cir. 1986). However, if the ALJ discusses each of the Plaintiff's impairments and concludes that neither render the Plaintiff disabled, no further analysis is required. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). "To require a more elaborate articulation of the ALJ's thought processes would not be reasonable." Id. Here, the ALJ discussed both Plaintiff's kidney condition and heart condition, and still decided that he was not disabled, and that determination is supported by the record.

## CONCLUSION

The ALJ's decision that Plaintiff was not disabled within the meaning of the Social Security Act is supported by substantial evidence.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

An appropriate Judgment shall accompany this Memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 27th day of September, 2006